[No. 40338.   Department Two.   January 8, 1970.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT JAMES
EMMETT, *Appellant*.*

*Patrick, Zylstra & Pitt*, by *Ted D. Zylstra*, for appellant
(appointed counsel for appeal).

*Edward C. Beeksma* and *Harold E. Baily*, for respondent.

NEILL, J.—Defendant appeals from convictions and sen-
tences on charges of second degree burglary and unlawful
possession of narcotics. A third count of second degree bur-
glary was dismissed at the close of the state's case.

Defendant did not introduce any evidence, being content
to stand on his challenge to the sufficiency of the evidence
as to all counts.

Error is assigned to the failure of the trial court to dis-
miss the two counts on which a guilty verdict was re-
turned and in allowing a deputy sheriff to testify as to
statements made by defendant after his arrest.

On the night of July 1, 1967, or early morning of July
2nd, the Clinton Pharmacy was burglarized and a quantity
of watches, billfolds, lighters, cigarettes, narcotics, and a

*Reported in 463 P.2d 609.

Swinger camera were taken. The owner of the pharmacy testified that he had seen the defendant in his store on June 30, 1967, and again on July 1st. He observed the defendant in the vicinity of the narcotics drawer on each occasion.

Defendant Emmett, Charleen Ducheane, and Miss Ducheane's boyfriend were living in a house in or near Clinton in Island County.

Defendant was arrested on July 2nd and placed in jail. His constitutional rights were adequately explained to him. He responded that he knew his rights, but did not make any statements at that time. On July 5th, while still in jail and not having been arraigned, he was again advised of his rights. He thereupon attempted to establish an alibi stating that he had been paid $10 and a wallet for inventorying a supply of narcotics for Miss Ducheane and her boyfriend. He further told the officer that he knew Jerry (the boyfriend) had burglarized the Clinton Pharmacy by "popping the back door" and that he told Jerry when he returned with "all of this stuff" that he "was crazy for . . . in his own back yard for such a small score." He also told the officer that Miss Ducheane could not write the inventory because her hand was infected "from a bum shot" and she couldn't write.

A deputy sheriff was permitted to testify—following a CR 101.20W hearing—as to statements made by the defendant while in custody. Some statements made prior to July 5th were suppressed.

The defendant did not testify at the hearing to suppress the testimony of the deputy sheriff. Defendant now contends that his original silence (after the July 2nd warning), the fact that he made no express waiver of his rights on July 5th, and the fact that he had been held in jail 4 days without arraignment or setting of bail, indicate an abuse of defendant's constitutional rights as set forth in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

The so-called "Miranda issue" is resolved in accordance with the findings of the trial court that the defendant hav-

ing been properly advised and warned, voluntarily, knowingly, and intelligently waived his right to remain silent.

We note that July 2, 1967, was a Sunday and that July 4th is a judicial holiday, thus a 4-day delay in arraignment and setting bail is understandable and reasonable. There was no pattern of continuous interrogation and no indication of questioning the defendant over his objection. The actions of this defendant in responding to the July 5th questioning bear considerable resemblance to the actions of the defendant in *State v. Collins*, 74 Wn.2d 729, 446 P.2d 325 (1968), wherein we reiterated the factors to be considered in determining the waiver of constitutional rights.

There is no presumption in favor of a waiver of constitutional rights. The state carries a heavy burden to prove that statements made by an accused are given in conjunction with or following a voluntary, knowing and intelligent waiver of rights. *State v. Davis*, 73 Wn.2d 271, 438 P.2d 185 (1968). We reviewed a similar contention in *State v. Blanchey*, 75 Wn.2d 926, 934, 454 P.2d 841 (1969), and stated:

> The question remains whether these facts show there was a knowing and intelligent waiver. If there is substantial evidence that defendant did not in fact realize that the detectives could use these statements against him, then he did not make a knowing decision to waive his rights regardless of the "voluntariness" of his statements. Of course it is impossible to establish conclusively what was going through defendant's mind at the time he spoke to the detectives. All that *Miranda* requires is evidence which shows, and which satisfies a heavy burden of proof, that defendant was aware of his rights and made a conscious decision to forego them. Here there is strong evidence that defendant completely understood his rights at the beginning of the trip back to Seattle. Defendant himself testified that he told the Seattle detectives that he was familiar with his rights. He had been warned twice and had demonstrated his understanding of his rights by exercising them while in custody in Canada. This previous exercise of his rights lends strong support to the conclusion that his subsequent statements were the result of a conscious decision to waive these rights.

*See United States v. Hayes, supra. [United States v. Hayes,* 385 F.2d 375 (4th Cir. 1967).]

We hold that the state has met its burden and the statements of defendant on July 5th were given pursuant to a voluntary, knowing, and intelligent waiver of his constitutional rights.

We pass then to defendant's contention that there is insufficient evidence to sustain a guilty verdict on the burglary charge. Miss Ducheane admitted that she was a drug addict; that she was, at the time of trial, an inmate of the state penitentiary by reason of forgery conviction; and that she was present with the defendant and her boyfriend at their Clinton house while they all discussed burglarizing the Clinton Pharmacy. Although this witness was a bit hazy as to dates, it is clear that she was testifying as to the incident here involved. She testified that, at about 3 a.m. of the night in question, defendant and her boyfriend left the house for the purpose of burglarizing the Clinton Pharmacy; that they took with them a crowbar with a blue handle; that they returned in about 45 minutes with cigarettes, cigarette cases, lighters, a Swinger camera, rolls of coins, and narcotics.

Miss Ducheane further testified that she talked with defendant and her boyfriend upon their return and that, in the presence of defendant, her boyfriend detailed the escapade to her, including the fact that they had to use the crowbar on the narcotics drawer.

The testimony of the officers was that the narcotics drawer had been pried open and that the object used left blue paint on the drawer. The marks on the drawer corresponded closely to Miss Ducheane's description of the size of the crowbar which defendant and the other man had taken with them.

These facts, which the jury could accept, directly implicate the defendant in the burglary.

This leaves the issue of sufficiency of the evidence on the narcotics charge. The state is charged with the burden of proving beyond a reasonable doubt that the defendant was

in possession of narcotics. No contention is made as to the possession element of this crime, but the defendant strongly urges that the state failed in its proof that the substance in possession of the defendant was a narcotic. We agree.

■ The purported narcotics are not in evidence. All of the goods seized by officers as being that taken in the burglary was suppressed. (A search warrant was issued without proper and sufficient affidavit in support of the petition.)

The druggist testified that certain named narcotics were missing from his store, but this did not establish that defendant was in possession of them. Miss Ducheane testified that narcotics labels were on containers that were a part of the "take" of the burglary.[1] However, there is a complete lack of identification.

There is no description of the drugs by reference to appearance, color, taste or odor, much less a chemical analysis thereof. The state appeared to be aware of its problem of proof and apparently intended to establish that Miss Ducheane "took a fix" from the substances possessed by the defendant, but as shown by a recitation of her testimony, the prosecutor did not ask this specific question.[2] the wit-

---

[1]The testimony of Miss Ducheane as to the charge of possession of narcotics is pivotal:

Q. And when they came back, did they have anything with them? A. Yes. Q. What? A. Everything. Q. Just tell me what you can remember about what they brought back. A. Narcotics. MR. ZYLSTRA: I am going to object to that as being a conclusion on the part of the witness. THE COURT: The objection is sustained at this point to the conclusion. The jury is instructed to disregard the use of the word "narcotics". Proceed. Q. Can you tell us specifically what, when you say "narcotics", what it was they brought back by name? A. Morphine, Dilaudid, Demerol, Mepergan, Digitoxin. Q. Now, was this labeled, or how did you tell what it was? A. It was labeled.

[2]Apparently in an attempt to identify some of the fruits of the burglary as narcotics, the prosecutor made the following inquiry:

Q. I see. Charleen, were you taking drugs at the time? A. Yes. Q. Had you had a fix or shot prior to the time that he came in with these from the store? A. You mean before he came in? Q. Yes. A. No, we didn't have anything. Q. Did you take a fix then from what was— A. (interposing) Yes. Q. And would you describe how you did that? What it was you used, and what particular drug you used, and how

ness, Miss Ducheane, was not an expert and the best that can be said for her testimony is that the defendant possessed containers which bore labels naming certain narcotics. It is not a crime to possess such containers. There is a total lack of proof of the corpus delicti, namely, that the substances possessed by the defendant were narcotics.

Our research discloses two prior cases wherein we have been confronted with a similar issue. *State v. Kekich*, 25 Wn.2d 482, 171 P.2d 210 (1946); *Seattle v. Love*, 61 Wn.2d 113, 377 P.2d 255 (1962). *Cf. People v. McLean*, 56 Cal. 2d 660, 16 Cal. Rptr. 347, 365 P.2d 403 (1961). Each is readily distinguishable from the case at bar.

In *Kekich*, we affirmed a conviction of possession of intoxicating liquor where the bottle of liquid bearing a common brand name of whiskey on the label contained a liquid of the color characteristic of whiskey was in evidence. Further, and of importance, the bottle bore an unbroken United States alcohol tax stamp sealing the cap. Here we have none of these probative factors.

In *Love*, we approved an instruction that a jury [may] consider a bottle containing liquid to be a bottle of whiskey where it was in evidence, the liquid was the color of whiskey of a known brand under its usual label, and the bottle bears an unbroken government seal. Again, these elements are missing in this case.

Affirmed as to the burglary and reversed as to the charge of possession of narcotics.

HUNTER, C. J., ROSELLINI, J., and DONWORTH, J. Pro Tem., concur.

---

you did it. A. I think it was Dilaudid. I'm not sure. I can't remember. THE COURT: Dilaudid? THE WITNESS: Uh-huh. Q. Have you used Dilaudid before? A. Yes. Q. And how it is taken, by mouth or by syringe? A. Uh-huh. Q. Which one? A. By syringe. Q. Do you do this in your arm? A. Yes. Q. Now, Charleen, after you had taken this fix, after they returned, would you describe what the effects of that are; what they do to you? A. I don't know. When you have a habit, it just relaxes you; supposedly makes you go to sleep too. It relaxes a little like when you are aching, you don't feel any more pain. Q. Did it relax you then in this instance? A. Yes.