[No. 2455–2.   Division Two.   February 17, 1978.]

THE STATE OF WASHINGTON, *Respondent*, v. BENJAMIN JESSE RILEY, *Appellant*.

*William P. Bergsten* and *Michael Jennings,* for appellant (appointed counsel for appeal).

*Donald F. Herron, Prosecuting Attorney,* and *Joseph D. Mladinov, Senior Deputy,* for respondent.

REED, J.—Defendant Benjamin Jesse Riley appeals from his conviction of first–degree murder of Diane Rasmussen, first–degree assault of Debra Rasmussen, first–degree murder of Susan Jean Smith and second–degree murder of Sharon Kay Vinson. We affirm.

On the evening of February 3, 1976, around 10:15 p.m., the Tacoma police responded to a call reporting a serious assault on two women at a local apartment complex at 3015 North Highland. When the officers arrived at the scene, they discovered two sisters, Diane and Debra Rasmussen, both of whom had been stabbed several times. While they received medical attention from a paramedical team, the women told the police that they had been repeatedly stabbed by a black male. Shortly thereafter, the two were rushed to the hospital, where Diane Rasmussen was pronounced dead on arrival.

During that evening, as the police searched the apartment complex and surrounding area for possible clues or witnesses, they learned that a black male, later identified as the defendant, had stopped about the time of the assaults at a nearby residence and requested use of a phone to call a

taxicab. The defendant then waited at the residence for approximately 20 minutes until the cab arrived.

Upon entering the cab, the defendant instructed the driver to take him to Fort Lewis. While enroute he changed his mind and asked to be taken to 8220 40th Avenue, West, the residence of Judy Mitchell, a prostitute; he arrived at her home at about 11 p.m. Mitchell and the defendant sat up until about 1 a.m. whereupon she directed the defendant to go into the bedroom and undress. A few moments later as she prepared to enter the bedroom, the police, who by now had both traced the cab and learned the identity of the defendant from friends of the Rasmussen sisters, arrived.

Upon learning from Mitchell that the defendant was present, Detective Hazuka of the Tacoma Police Department entered the bedroom and found the defendant naked in bed. He instructed the defendant to put on a pair of pants and then brought him out to the front room. When defendant identified himself and explained that he had arrived at the residence in a cab from an address near the scene of the homicide and assault, Detective Hazuka placed defendant under arrest and immediately informed him of his constitutional rights.

The defendant was handcuffed, given a blanket to cover himself and then taken downtown to the police station. During this trip there was no further discussion with the defendant. At the station, the defendant was escorted into an office where the handcuffs were removed. The defendant was again read his rights step–by–step from a form used by the Tacoma Police Department. The defendant had before him during the reading a copy of the rights which was furnished by Investigator Peltier, who had now joined Detective Hazuka. As each right was read he acknowledged he understood it; he then signed the acknowledgement of rights form.

During the questioning that ensued, the defendant was still dressed in pants, with a blanket covering the top part of his body. The defendant did not complain or seem

bothered by his attire, nor did he exhibit any fatigue or impairment of his faculties. He later said he was nervous but had controlled his nervousness so that it would not be apparent to the officers.

The defendant initially told the officers he had met the Rasmussen sisters downtown and had returned with them to their apartment, intending to rob them with the assistance of one Henderson. When they arrived at the apartment, Henderson, who was already there, attacked the sisters with a knife.

The officers told the defendant they did not believe his story, whereupon the defendant admitted that Henderson did not exist and that he alone had stabbed the women in self–defense after an argument arose over money. He added that, after the assaults, he took the women's purses and went to the Mitchell home. He also admitted the knife found with his clothing at the Mitchell residence was the one he used in the crime. Defendant was then asked to repeat the story in narrative form as it was typed by Investigator Peltier; he then read, confirmed and signed the completed statement before a notary public. Oral interrogation of the defendant lasted from 1:55 a.m. until 2:50 a.m.; reducing his statement to typewritten form took from 2:50 a.m. until 3:30 a.m., and by the time the defendant was fingerprinted, booked on charges of first–degree murder of Diane and first–degree assault upon Debra, and placed in a jail cell, it was 5 a.m.

At approximately 8:30 a.m. that morning, the defendant, who had just finished breakfast, met with a legal intern from the office of assigned counsel. The intern informed the defendant he would be arraigned on the following day and that until then he should not speak with anyone other than personnel from the assigned counsel's office.

At about 3:30 p.m., Detectives Stout and Murphy from the Pierce County Sheriff's office, who were unaware he was represented by counsel, removed the just–awakened defendant from his cell and questioned him regarding the March 28, 1975, deaths of Susan Jean Smith and Sharon

Vinson at a local sauna and massage parlor. The officers suspected the defendant because the sauna deaths had been perpetrated in a manner similar to the assaults on the Rasmussen women. An hour into the interview, Detective Stout informed the defendant the prosecutor's office had indicated that if he cooperated it was possible he could be charged with one count of first–degree murder and one count of second–degree murder. The distinction between the two degrees of murder was not explained, but he was told that second–degree was a lesser charge.

After approximately 1 hour, the defendant admitted he was present while one Bernard Williams had committed the murders, and he signed a statement to this effect.

The next morning at about 8 a.m. the detectives visited the defendant and told him they did not believe his story. The defendant then admitted that he and not Williams had committed the murders, and signed a revised statement at 9:20 a.m. Thereafter the defendant was charged with one count of first–degree murder of Smith and one count of second–degree murder of Vinson. These charges were consolidated for trial with the Rasmussen charges and the defendant entered a plea of not guilty by reason of insanity to all charges. After a CrR 3.5 hearing, defendant's statement and confession in both cases were ruled admissible and the consolidated causes proceeded to trial.

On the opening day of trial, June 7, 1976, 11 jurors were selected but not sworn. These jurors were permitted to go home that evening but were told to avoid any media coverage of the case. That night and the following morning, two articles appeared in the local papers, one stating that defendant's motion for acquittal by reason of insanity had been denied earlier by the presiding judge. The following morning, defendant moved for a mistrial because of this alleged prejudicial publicity. The motion was denied and defendant was found guilty on all four counts; thus, this appeal.

### THE RASMUSSEN CASE

The defendant first challenges the trial judge's CrR 3.5 finding that his original oral statement and subsequent confession to the assaults upon the Rasmussen sisters were voluntary and admissible against him at trial. Defendant argues he did not make a knowing and intelligent waiver of his rights and that his statements were rendered involuntary because of his mental limitations and the pressures to which he was subjected.

■ It is well established that the State bears a heavy burden of proof in demonstrating that admissions made by a defendant were voluntary and that he knowingly and intelligently waived his rights. *State v. Emmett,* 77 Wn.2d 520, 463 P.2d 609 (1970); *State v. Blanchey,* 75 Wn.2d 926, 454 P.2d 841 (1969); *State v. Collins,* 74 Wn.2d 729, 446 P.2d 325 (1968); *State v. Davis,* 73 Wn.2d 271, 438 P.2d 185 (1968). A waiver has been defined as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 82 L. Ed. 1461, 58 S. Ct. 1019, 1023, 146 A.L.R. 357 (1938). There is no presumption in favor of a waiver of a constitutional right; rather the courts have been instructed to "'indulge every reasonable presumption against waiver'". *Barker v. Wingo,* 407 U.S. 514, 525, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1973); *State v. Davis, supra; State v. Collins, supra; State v. Emmett, supra.*

Here the defendant was a high school graduate capable of reading and writing the English language. He confessed only after he had twice been adequately warned of his constitutional rights, and after he had acknowledged he understood his rights and signed a form to that effect. There is no evidence that the defendant was threatened, tricked or cajoled into waiving these rights. *See State v. Davis, supra.* He never requested a lawyer nor did he display any reluctance in answering questions. During the interrogation, the defendant appeared neither tired nor intoxicated but was calm and quiet. These factors indicate that the defendant made a knowing and intelligent waiver of his rights. *State*

*v. Bower,* 73 Wn.2d 634, 440 P.2d 167 (1968); *State v. Haverty,* 3 Wn. App. 495, 475 P.2d 887 (1970).

■ The defendant urges, however, that he was incapable of making a knowing and intelligent waiver, pointing out that two psychiatrists had found him to be a paranoid schizophrenic and deficient in his capacity for abstract thinking. Initially, it warrants mention that neither of these doctors testified at the CrR 3.5 hearing, but only at the defendant's trial. Of significance is their testimony that despite his abnormalities and deficiencies, he was capable of understanding his rights. Accordingly, we will not disturb the trial court's finding that defendant was capable of making and did make a knowing, intelligent waiver of his rights. *State v. McDonald,* 89 Wn.2d 256, 571 P.2d 930 (1977).

The same is true of defendant's challenge to the voluntariness of the confession which followed his intelligent waiver. We harbor no doubt that his confession was the product of a rational intellect and free will. *Blackburn v. Alabama,* 361 U.S. 199, 4 L. Ed. 2d 242, 80 S. Ct. 274 (1960). That the defendant understood the meaning and effect of his confession is clear from his initial attempt to place the blame on a fictitious "Henderson." It was only when this fabrication failed to remove him from suspicion that he confessed. Even in that confession he sought to rationalize his actions by claiming he acted in self-defense. The testimony of a defense psychiatrist at trial reinforces this view; he stated the defendant was sane at the time he confessed and realized the possible consequences of making a statement.

Additionally, there was ample evidence that no fear, force, threats or promises were made by the police to coerce or induce the defendant's confession. *Lynumn v. Illinois,* 372 U.S. 528, 9 L. Ed. 2d 922, 83 S. Ct. 917 (1963); *Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 9 L. Ed. 2d 357, 83 S. Ct. 448 (1963); *State v. Sweet,* 71 Wn.2d 172, 426 P.2d 983 (1967); *State v. Streeter,* 67 Wn.2d 39, 406 P.2d 590 (1965). The interrogation was neither long in duration nor

intense. *Clewis v. Texas,* 386 U.S. 707, 18 L. Ed. 2d 423, 87 S. Ct. 1338 (1967). Although the defendant stated at the CrR 3.5 hearing that he had not slept for 48 hours before his arrest, during the interrogation he gave no indication that he was tired or that he desired rest. In fact he appeared calm, alert and coherent and admits he was capable of controlling his outward emotions. Further, although defendant argues on appeal that, because he was clad only in pants and blanket he was physically coerced, he did not complain of the cold or otherwise express any discomfort with his partially clad condition. His confession did not, therefore, result from any physical deprivation. *Greenwald v. Wisconsin,* 390 U.S. 519, 20 L. Ed. 2d 77, 88 S. Ct. 1152 (1968); *Sims v. Georgia,* 389 U.S. 404, 19 L. Ed. 2d 634, 88 S. Ct. 523 (1967).

### THE SAUNA MURDERS

Our analysis of the voluntariness problem raised regarding the Rasmussen confession is also dispositive of many of the issues raised in connection with the sauna confessions. In addition, however, defendant claims that the sauna confessions were inadmissible because (1) it was improper to interrogate him after he had consulted with counsel, (2) that deception was used to bring about a waiver of his rights, and (3) his statement and confession were induced by a promise of leniency.

With regard to the first contention, there is no constitutional protection prohibiting the prosecution or its agents from communicating directly with an arrested person represented by counsel. *State v. Vidal,* 82 Wn.2d 74, 508 P.2d 158 (1973); *State v. Nicholson,* 77 Wn.2d 415, 463 P.2d 633 (1969). One who consents to be questioned without his attorney being present cannot attack any admissions on the basis of deprivation of his right to counsel. *State v. Rowe,* 77 Wn.2d 955, 468 P.2d 1000 (1970); *State v. Adams,* 76 Wn.2d 650, 458 P.2d 558 (1969); *State v. Vidal, supra.* The defendant's contention that the officers practiced deception by telling him it was "all right to talk with

them" has no merit. Here, neither officer knew the defendant was represented by counsel. Both denied making the above statement and it is undisputed from their testimony, as well as the defendant's, that he knew he had the right to remain silent, and the right to have his attorney present during questioning. There was no deception employed such as would render the defendant's waiver of his constitutional rights involuntary. *State v. Braun,* 82 Wn.2d 157, 509 P.2d 742 (1973).

We next address the issue pertaining to the promise to reduce one count to second–degree murder. In *Malloy v. Hogan,* 378 U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489 (1964), it was held that whenever the voluntariness of a confession is called into question, its admissibility in state prosecutions is governed by the same standard applied in federal prosecutions since 1897. Citing *Bram v. United States,* 168 U.S. 532, 42 L. Ed. 568, 18 S. Ct. 183 (1897), the *Malloy* court stated at page 7:

> Under this test [Fifth Amendment], the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was "free and voluntary: that is, [it] must not be extracted by any sort of threats or violence, *nor obtained by any direct or implied promises, however slight,* nor by the exertion of any improper influence.

(Italics ours.) *See also State v. Streeter, supra; State v. Sweet, supra; State v. Riley,* 17 Wn. App. 732, 565 P.2d 105 (1977).

The admissibility of admissions is judged by the same standard announced in *Malloy* with respect to confessions. *State v. Sweet, supra; State v. Porter,* 5 Wn. App. 460, 488 P.2d 773 (1971).

In the present instance, we recognize the difficulty of measuring the extent to which Riley was affected by the promise of a reduced charge. *See Bram v. United States, supra; Grades v. Boles,* 398 F.2d 409 (4th Cir. 1968). A promise of leniency standing alone, does not, however, automatically invalidate a confession; rather, the totality of

the circumstances must be closely examined to determine its impact. *Brady v. United States,* 397 U.S. 742, 25 L. Ed. 2d 747, 90 S. Ct. 1463 (1970); *Haynes v. Washington,* 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336 (1963); *State v. Riley, supra.*

Our independent examination of the record convinces us that the defendant's original admission regarding the sauna murders was not induced by the promise of a reduced charge, and that substantial evidence exists to support that finding by the trial judge. Although the officers candidly admit the offer was made to the defendant, who was in custody and without counsel present, in order to induce a confession, we believe it was not a motivating factor in the defendant's decision to speak. At the CrR 3.5 hearing, the defendant testified that when the officers removed him from his cell and asked him to cooperate with them, he believed his attorney must have given them permission to talk with him. However, because he was not sure what was going on and did not know why he had been brought out for questioning, he gave them a false statement. It is significant that when first discussing why he gave the statement, the defendant did not allude to the reduced charge offer. Further, when this offer was made, defendant was not advised of the difference between first– and second–degree murder nor was he given any explanation as to the difference in penalties. Although defendant was informed that second–degree murder was a lesser charge, his reaction, which is reflected in his testimony at the CrR 3.5 hearing, was "[they] told me second degree was less but I still didn't understand what they were talking about." This bare offer, without explanation, left the defendant to determine for himself the nature and significance of the choice between unfamiliar crime classifications. We doubt that he was able to appreciate the distinction, considering his limited capacity for abstract or conceptual thinking. As both Dr. Walloch and Dr. Jarvis testified at trial, when the voluntariness issue was again raised, this was the one area in which defendant's mental faculties were deficient. Thus, it is

apparent that the defendant simply did not understand the offer nor treat it as being of benefit to him and as an inducement to confess. Finally, in light of these circumstances, the fact that the defendant did not confess for more than hour after he was told of the offer, further convinces us the offer had little if any impact.

Our careful consideration of the totality of circumstances leads us to conclude that the offer of the reduced charge did not "overbear petitioner's will to resist and bring about confessions not freely self–determined". *Rogers v. Richmond*, 365 U.S. 534, 544, 5 L. Ed. 2d 760, 81 S. Ct. 735 (1961); *State v. Riley, supra*. Instead, the defendant chose "to speak in the unfettered exercise of his own will". *Malloy v. Hogan, supra* at 8. Although when his counsel inquired as to whether he talked to the officers because of the promise, defendant said, "I talked to them," this does not alter our position; the fact remains that the defendant had been talking with them for 2 hours already. Under these circumstances, this ambiguous statement falls far short of supporting a conclusion that the offer induced his admission.

With respect to the defendant's *written* confession, which did not follow until *the next morning,* its voluntary nature is evidenced by the defendant's final remark that "I just want to get this off my chest and get the thing over with." When one considers the time lapse between his earlier attempt to exculpate himself by blaming Henderson and the subsequent confession, and the fact that the offer was not repeated, defendant's remark reflects that the compelling reason behind his confession was not the offer, but a need for a "purge of conscience." *Cf. Commonwealth v. Moody*, 429 Pa. 39, 239 A.2d 409, 413 (1968); *Commonwealth v. Greene*, 456 Pa. 195, 317 A.2d 268 (1974); *People v. Reid*, 233 Cal. App. 2d 163, 43 Cal. Rptr. 379 (1965); *People v. Spencer*, 66 Cal. 2d 180, 57 Cal. Rptr. 163, 424 P.2d 715 (1967). This conclusion is reinforced by the testimony of Dr. Walloch, who agreed that defendant's remark

implied a consciousness of wrongdoing and a desire to clear up the murders.

Finally, we find no merit in Riley's contention that his defense suffered prejudice requiring reversal of this conviction when the trial judge permitted the jury to separate the night before the trial. Our review of the record reflects that the defendant was not prejudiced. Inquiry by the trial judge disclosed that only *one* juror was exposed to any media coverage of the trial and that was merely a factual report on television that the defendant's trial was to begin that day. *See State v. Knapp,* 14 Wn. App. 101, 540 P.2d 898 (1975). The fact that jurors are allowed to separate before they are sworn is consistent with insuring a defendant's right to trial by a fair and impartial jury. Until sworn, jurors may yet be challenged on the basis that prejudicial publicity or improper conduct has tainted their ability to perform. We find no prejudice and approve the trial judge's order denying a mistrial.

The judgments are affirmed.

PEARSON, C.J., and PETRIE, J., concur.

Petition for rehearing denied March 13, 1978.

Review denied by Supreme Court July 21, 1978.