[No. 45595. En Banc. February 8, 1979.]

THE STATE OF WASHINGTON, *Respondent,* v. ALVIN L. GILCRIST, ET AL, *Appellants.*

604

*Stephen E. Llewellyn* and *Lutcher & Llewellyn,* for appellant Gilcrist.

*James K. Hayner* and *Minnick, Hayner & Zagelow, P.S.,* for appellant Agtuca.

*Arthur R. Eggers, Prosecuting Attorney,* and *Larry Siegel* and *Jerry A. Votendahl, Deputies,* for respondent.

*Wayne Lieb* and *Sally Harrison* on behalf of Institutional Legal Services Project, amici curiae.

BRACHTENBACH, J.—An inmate of the state penitentiary, inmate Johnson, was stabbed 31 times by other inmates. Appellants Gilcrist and Agtuca were charged with and convicted by a jury of that first–degree assault. Later both appellants were determined to be habitual criminals under RCW 9.92.090. Their appeals were consolidated. We affirm.

While there is conflicting testimony, the jury could have believed the State's witnesses as to the following testimony: (1) Prison guard Thompson saw appellants Agtuca and Gilcrist attack and repeatedly stab inmate Johnson with

knives crafted from broom handles and metal rods. Appellants immediately fled to an adjoining cell block which guard Thompson locked to secure the situation, while he sought help from other guards. (2) Shortly thereafter, both appellants approached guard Hartford, dropped their pants to show they were not concealing weapons and asked for medical treatment.

From the time the appellants were taken to the prison hospital through their assault and then habitual criminal trials, these cases present a bizarre series of events. We will discuss the alleged facts and assigned error as to each issue, but briefly summarize several events to put our discussion into perspective.

1. Appellants complain that they were required to wear prison issued clothing, not uniforms but slacks, sports coats, etc., rather than their personally owned clothing.

2. A witness threw water upon the jury.

3. Appellant Gilcrist, in open court, gave the trial judge "the finger."

4. Appellants during trial had a series of misadventures such as ripped pants, spilled liquids upon clothing, claimed illness.

5. During closing argument, a bomb exploded outside the courtroom.

6. Apparently after the bomb explosion, the appellants were shackled, and likewise at their habitual criminal trial.

I

The first issue is whether incriminating statements by Agtuca were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

When Agtuca was in the prison hospital he was given *Miranda* warnings by a Walla Walla city police detective. Agtuca refused to make any statements until he first spoke with appellant Gilcrist. That request was denied and Agtuca made no statements. Minutes later Agtuca was in the hospital waiting room under the supervision of guard

Olson who gave no *Miranda* warning but talked with Agtuca. Olson expressed surprise at Johnson's stabbing, saying that he thought that Agtuca, Gilcrist and Johnson "were partners." Agtuca sought assurance that "This is between you and me," to which Olson said "Okay, this is between you and I." Agtuca then told Olson that he had been standing in Curtis Johnson's cell, "looking in the mirror and combing his hair . . . [a]nd . . . the next thing he knew Johnson attacked Gilcrist, and he and Gilcrist were helping each other trying to keep Johnson off them."

■ This assignment is without merit under the principle that "Where a defendant has been adequately and effectively warned of his constitutional rights, it is unnecessary to give repeated recitations of such warnings prior to the taking of each separate in–custody statement." *State v. Vidal,* 82 Wn.2d 74, 78, 508 P.2d 158 (1973); *State v. Rowe,* 77 Wn.2d 955, 959, 468 P.2d 1000 (1970). Olson's discussion with Agtuca did not violate Agtuca's *Miranda* rights.

However, Olson admits that, prior to Agtuca's statement, he agreed with Agtuca "Okay, this is between you and I." Agtuca claims that, due to this statement, he was tricked into waiving his *Miranda* rights. "[A]ny evidence that the accused was threatened, tricked or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda v. Arizona, supra* at 476, cited with approval in *State v. Davis,* 73 Wn.2d 271, 287, 438 P.2d 185 (1968).

■ Deception alone does not make a statement inadmissible as a matter of law. Rather, under *Miranda,* the inquiry is whether the deception was such as to make a waiver of constitutional rights involuntary. *State v. Braun,* 82 Wn.2d 157, 161, 509 P.2d 742 (1973); *State v. Riley,* 19 Wn. App. 289, 297, 576 P.2d 1311 (1978). The test of voluntariness is "whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self–determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth."

*Rogers v. Richmond,* 365 U.S. 534, 544, 5 L. Ed. 2d 760, 81 S. Ct. 735 (1961), cited with approval in *State v. Braun, supra* at 161–62. If deception were involved, it was not the type which overbore Agtuca's will to resist.

■ Moreover, we note that Olson's testimony added little to the State's case against Agtuca. The eyewitness testimony of officer Thompson provided overwhelming evidence of guilt. Agtuca's incriminating statement was unnecessary for conviction, and its admission, if error, was harmless. *Chapman v. California,* 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967); *State v. McDonald,* 89 Wn.2d 256, 266, 571 P.2d 930 (1977).

## II

Next, it is contended that Agtuca's Sixth Amendment right to cross–examine a codefendant was violated when officer Hartford was allowed to testify that appellant Gilcrist approached him shortly after the attack on inmate Johnson and said "We aren't going to hurt anybody . . . Kenny [Agtuca] has been stuck."

We are cited to *Bruton v. United States,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968). This case is unlike *Bruton.* There the United States Supreme Court ruled inadmissible hearsay evidence of a codefendant's out–of–court oral confession that implicated the defendant when the codefendant did not take the stand. Here Gilcrist took the stand and was examined by Agtuca's attorney. Agtuca's confrontation rights were not violated.

## III

The day after the stabbing, a correctional officer returned to the area of the penitentiary where Johnson had been stabbed to look for evidence. He noticed that adhered to the wall was a hair in a blood smear. The officer chipped the blood smear off the wall and delivered it to the Walla Walla police. The appellants first learned of this potential piece of evidence at trial. The State never produced, nor provided appellants with this evidence because it apparently was lost by the Walla Walla police.

Appellants rely on *State v. Wright,* 87 Wn.2d 783, 557 P.2d 1 (1976), to support their claim that the unavailability at trial of the hair and blood sample lost by the Walla Walla police violated their due process rights. We disagree.

■ To bring their claim within due process clause protection, Gilcrist and Agtuca must show that the lost evidence "was material to guilt or innocence and favorable to the appellant[s]." *State v. Wright, supra* at 790. At trial, they did not present any forensic experts to testify to its materiality. They did, however, call the senior detective of the Walla Walla police. The detective testified that if the missing hair were blond and if it were compared to a black sample hair, a forensic test probably would conclude that the hairs did not come from the same person. However, he also testified that the tests usually report only that the hairs are similar or dissimilar and that he had "never seen a test performed that would say that a particular hair came from one individual to the exclusion of all other persons."

Thus, appellants have presented little in the record to support their claim that the missing hair could point to others as perpetrators of the assault or corroborate their version of the facts that they were not present at the assault. The missing evidence was not necessary for a prima facie defense, and, at best, only would establish circumstantially appellants' innocence. Appellants' due process rights were not violated by the unavailability of the lost evidence. *See generally* 53 Wash. L. Rev. 573 (1978).

IV

Agtuca claims that, due to pretrial publicity, his due process rights were violated by the trial court's denial of his change of venue motion. He contends that 19 news articles prevented him from receiving a fair trial in Walla Walla. We disagree.

■ An apparent probability of prejudice must be shown to demonstrate that a denial of a change of venue motion violated due process. *State v. Stiltner,* 80 Wn.2d 47, 55, 491 P.2d 1043 (1971); *State v. Warwick,* 16 Wn. App. 205, 208,

555 P.2d 1386 (1976). Agtuca has not made that showing. The challenged articles generally dealt with stabbings in the Walla Walla area or at the prison. The news accounts were responsible and factual, rather than inflammatory. The appellants are only mentioned by name in one article and only five other articles pertain to the stabbing of inmate Johnson. Jury selection was careful with the judge excusing two persons who had read the previous day's news account of the upcoming trial and retaining five other persons who had read the article only after they assured him that they were still impartial. Only two of those five persons were selected as jurors.

The record shows no probability of prejudice and thus Agtuca's due process rights were not violated. *State v. Crudup*, 11 Wn. App. 583, 587–89, 524 P.2d 479 (1974); *see* 82 Dick. L. Rev. 616, 620 n.27 (1978).

## V

█ Appellants cite *Estelle v. Williams*, 425 U.S. 501, 48 L. Ed. 2d 126, 96 S. Ct. 1691 (1976), to support their claim that their constitutional rights were violated when they were required at trial to wear state–provided clothing rather than their own personal clothing. We disagree. This case is unlike *Estelle* in which the defendant "appeared at trial in clothes that were distinctly marked as prison issue." *Estelle*, at 502. Here appellants were dressed in sports coats, slacks, ties and shirts. Their right to a fair trial was not violated by being required to wear state–selected clothing. It was explained, on the record, that this procedure substantially reduced the likelihood of using personal clothing to carry in or out contraband.

## VI

During voir dire, the trial court excused seven jurors for cause but denied three of appellants' challenges for cause. Appellants exhausted their peremptory challenges before the jury was impaneled and thus were unable to remove the third challenged juror, McMannis, when the court denied their challenge for cause against him.

Appellants cite *State v. Parnell,* 77 Wn.2d 503, 508, 463 P.2d 134 (1969), in support of their claim that

> A refusal to sustain challenges for proper cause, necessitating peremptory challenges on the part of the accused, will be considered on appeal as prejudicial where the accused has been compelled subsequently to exhaust all his peremptory challenges before the final selection of the jury.

We disagree that *Parnell* applies here.

This case is different from *Parnell* where the challenged juror had inadvertently, but attentively, sat through Parnell's preliminary hearing. *Parnell,* at 504–05. The challenged jurors here were (1) a junior college grounds keeper who had worked with inmates attending college classes and didn't like the way the inmates "conducted themselves" there or "the way they took care of equipment"; (2) a woman who once had been the victim of an assault; and (3) McMannis, who had nephews in the prison and whose car had been stolen by an inmate in 1937. The challenges were denied only after each of the challenged jurors assured the court, in response to direct questions by the judge, that they were impartial despite their experiences.

"The granting or denial of a challenge for cause is within the discretion of the trial judge, and will not constitute reversible error in the absence of a manifest abuse of discretion." *State v. Aiken,* 72 Wn.2d 306, 350, 434 P.2d 10 (1967), *rev'd on other grounds,* 403 U.S. 946 (1971). The trial court here did not abuse its discretion manifestly and appellants were not denied their right to an impartial jury. In fact the trial court excused a number of jurors for cause and demonstrated careful attention to the selection of an impartial jury.

## VII

The next assignment involves two incidents. Appellants' first witness asked for a cup of water and then threw it on several jurors. Second, as appellant Gilcrist's counsel was making his closing statement, a bomb exploded outside the courtroom. These events prompted appellants to move

unsuccessfully, in each instance, for a mistrial. They rely on *State v. Swenson*, 62 Wn.2d 259, 382 P.2d 614 (1963), to support their claim that the trial court erred when it denied their mistrial motions because the trial irregularities created an atmosphere that deprived them of the fundamentals of due process. We disagree.

As a general rule, the trial courts have wide discretionary powers in conducting a trial and dealing with irregularities which arise. *Swenson*, at 276; *State v. Blum*, 17 Wn. App. 37, 42, 561 P.2d 226 (1977). A mistrial should be granted only when "nothing the trial court could have said or done would have remedied the harm done to the defendant." *Swenson*, at 280; *State v. Case*, 49 Wn.2d 66, 72, 298 P.2d 500 (1956). In other words, a mistrial should be granted only when the defendant has been so prejudiced that nothing short of a new trial can insure that defendant will be tried fairly. *State v. Lewis*, 19 Wn. App. 35, 46, 573 P.2d 1347 (1978). Only those errors which may have affected the outcome of the trial are prejudicial. *State v. Martin*, 73 Wn.2d 616, 627, 440 P.2d 429 (1968).

While the irregularities in *Swenson* were of such a number and magnitude as to affect the outcome of that trial, the irregularities here do not require a mistrial. In *Swenson*, the defense counsel's cross-examination was stifled by the court's expression of concern for the key witness who was pregnant, by the fact that the witness was at times physically unable to continue her testimony, and by verbal courtroom attacks on defense counsel by two spectators who were the key witness' mother and brother. *Swenson*, at 272–76.

This case does not exhibit the same quantum of irregularities. About the water throwing incident, the trial court noted that granting the mistrial motion would invite future courtroom misbehavior. It then gave a general curative instruction. About the bombing incident, the court noted that, while the jurors heard an explosion, they did not know its cause or source. Moreover, it occurred within 1 hour of

completion of a 5-day trial and after both parties had rested their cases.

We cannot say that the trial court abused its discretion when it ruled that the events here did not so prejudice appellants as to require a new trial. *See State v. Lewis, supra* at 46. Appellants' due process rights were not violated when the court denied their mistrial motions.

## VIII

Appellants assert that the security measures instituted immediately after the bombing incident and later at the habitual criminal proceeding violated their fair trial rights. We disagree.

The record is unclear and incomplete about the challenged security measures. The record does not disclose what security measures were taken immediately after the bomb explosion. Apparently appellants were manacled but their attorneys did not note this fact for the record and did not object. At the later habitual criminal proceeding, which was part of the underlying assault trial, *State v. Keith,* 86 Wn.2d 358, 360, 544 P.2d 747 (1976), appellants' attorneys objected on their clients' behalf "to the security measures and their having chains on." Apparently, appellants were in arm and leg chains and were seated directly behind their attorneys, but were still able to confer with them. The court noted appellants' objection and instructed the jury to draw no inferences from the measures.

While we think that under the better practice a trial court should conduct a security measures hearing and state its reasons for the record, we do not believe the use of security measures here violated appellants' right to a fair trial. In this case, Gilcrist gestured obscenely to the court; he and Agtuca delayed their trial by spilling liquids on their clothing; their first witness tossed water on the jury; a number of their other inmate witnesses testified that they practiced martial acts within the prison; and, a bomb exploded outside the courtroom. "[W]hen the facts warrant, it is within the discretion of the court to require that

[defendants] be shackled, for the protection of everyone in the courtroom and its vicinity." *Loux v. United States,* 389 F.2d 911, 919 (9th Cir. 1968).

Amicus curiae Institutional Legal Services informs us that, shortly after appellants' assault trial but before their habitual criminal proceeding, the Walla Walla Superior Court entered a detailed courtroom security order that applies to all inmates, regardless of circumstances. That order is not in the record before us, nor was it challenged by appellants. Accordingly, we refrain from commenting on the order or amicus curiae's challenge to it. *State v. Smith,* 88 Wn.2d 639, 645 n.1, 564 P.2d 1154 (1977); *Long v. Odell,* 60 Wn.2d 151, 154, 372 P.2d 548 (1962). Rather, we hold that under the particular facts of this case, appellants' fair trial rights were not violated by the trial court's use of the security measures that appear in the record.

## IX

Appellants claim that the procedure used by the Walla Walla prosecutor to select them to be prosecuted as habitual criminals violated their due process rights. They contend that the procedure did not comply with *State v. Lee,* 87 Wn.2d 932, 934, 558 P.2d 236 (1976) and *State v. Nixon,* 10 Wn. App. 355, 356-57, 517 P.2d 212 (1973), which ruled that prosecutorial discretion in applying the habitual criminal statute must be tempered by procedural due process. There was no error in this regard.

While *Lee* and *Nixon* ruled that the King County prosecutor's procedures complied with procedural due process, they did not hold that those procedures need be adopted by every prosecutor in all respects. Rather, the holdings are that the procedure employed by a prosecutor's office must include minimum protections against unfair and arbitrary decisions.

In this case, the prosecutor complied with a majority of the procedures approved in *Lee* and *Nixon,* but admits that he did not consult with appellants' attorneys, did not prepare a resumé of the pending charge, and did not conduct a

staff meeting to decide whether to file the habitual criminal charge. We do not view these deviations from the *Lee* and *Nixon* procedures as grounds invalidating the procedure by which appellants were selected for prosecution as habitual criminals. Rather, the procedure was tailored to the peculiar problems of a county which contains a state penitentiary.

Instead of conducting a staff meeting, the prosecutor conferred and corresponded with the special deputy prosecutor for penitentiary cases to decide whether to press the habitual criminal charges. The prosecutor did not prepare a resumé since he himself was the person handling the habitual criminal information. And, while he did not consult appellants' attorneys, he did consult the prosecutors involved in appellants' other convictions. Moreover, the prosecutor was unusually familiar with appellants' criminal histories because of his dealings with the state penitentiary. The procedure by which the prosecutor decided to charge Gilcrist and Agtuca as habitual criminals did not violate their due process rights.

## X

Gilcrist's October 1972 conviction for robbery, which served as a basis for his habitual criminal conviction here, served also as a basis for an earlier habitual criminal conviction, which was reversed in 1977. He argues that the use of that robbery in two habitual criminal convictions violates his right against double jeopardy.

Appellant misconceives the natures of both the double jeopardy clause and a habitual criminal proceeding. A habitual criminal proceeding is part of the underlying felony trial, in this case a trial for first–degree assault. *State v. Keith, supra* at 360. The prohibition against double jeopardy is not violated by increased penalties for recidivists. The increased penalties are not punishments for earlier crimes; rather, the fact of the earlier crime aggravates the commission of the latest crime and warrants the imposition of a longer sentence. *See Gryger v. Burke,* 334

U.S. 728, 832, 92 L. Ed. 1683, 68 S. Ct. 1256 (1948); note, *The Constitutionality of Statutes Permitting Increased Sentences for Habitual or Dangerous Criminals,* 89 Harv. L. Rev. 356, 361 n.29 (1975).

Gilcrist's double jeopardy rights were not violated.

## XI

Finally, Gilcrist claims that his right to a fair trial was violated when the court permitted the prosecutor to amend the habitual criminal information. We disagree.

In his closing argument, Gilcrist noted that the habitual criminal information incorrectly charged him as having committed a felony in 1975 instead of 1974. The prosecutor then moved and was allowed to amend the information to correct the error. Gilcrist does not deny the existence of the 1974 crime nor does he demonstrate why the amendment was prejudicial. The error was clerical and its correction did not prejudice substantially Gilcrist's rights. *See State v. Primeau,* 70 Wn.2d 109, 113, 422 P.2d 302 (1966).

The convictions of Gilcrist and Agtuca for first–degree assault and as habitual criminals are affirmed.

UTTER, C.J., and ROSELLINI, STAFFORD, WRIGHT, HORO-WITZ, DOLLIVER, and HICKS, JJ., concur.