IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39256-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| J. JESUS GUTIERREZ-VALENCIA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Following a jury trial, Jesus Gutierrez-Valencia was convicted of first degree kidnapping, second degree rape, second degree assault, unlawful imprisonment, felony harassment, and interfering with reporting of domestic violence and was later sentenced. On appeal Mr. Gutierrez-Valencia argues that he was afforded ineffective assistance of counsel, that the trial court improperly allowed the jury to consider inadmissible hearsay, and that the cumulative effect of the errors deprived him of a fair trial.

We disagree and affirm.

BACKGROUND

Vera[1] and Mr. Gutierrez-Valencia were in a romantic relationship and sporadically resided together between 2010 and 2019. In October 2018, at the directive of Vera, Mr. Gutierrez-Valencia moved from her apartment. After the breakup, Mr. Gutierrez-Valencia would daily park his truck near Vera's residence. Vera would often allow Mr. Gutierrez-Valencia to enter her apartment, and occasionally permitted him to stay the night.

On January 9, 2019, Vera dropped her daughters off at school before returning to her apartment. Upon her arrival, Vera found Mr. Gutierrez-Valencia waiting for her. Vera allowed Mr. Gutierrez-Valencia to enter her apartment; thereafter, their accounts of what occurred diverge.

VERA'S ACCOUNT

Vera testified that Mr. Gutierrez-Valencia claimed her sweater smelled of men's cologne and accused her of being with another man. Mr. Gutierrez-Valencia began striking Vera in the face with a closed fist. Mr. Gutierrez-Valencia told Vera that he wanted to have sex with her and, out of fear, she complied. Mr. Gutierrez-Valencia pushed Vera into the bedroom where the two engaged in various sexual acts, including intercourse.

---

[1] To protect the privacy interests of the victim, we use a pseudonym throughout this opinion.

After about 20 minutes in the bedroom, the two went to the kitchen. Even though Vera repeatedly denied she was seeing another man, Mr. Gutierrez-Valencia insisted that Vera inform him who she was sleeping with. When the opportunity arose, Vera attempted to escape through her front door. Mr. Gutierrez-Valencia grabbed Vera by her hair and pulled her back inside the apartment. Vera resisted by clinging to the doorframe, and screaming and yelling for help.

Vera eventually fell to the floor inside the apartment where Mr. Gutierrez-Valencia repeatedly hit and kicked her. As Vera attempted to get up from the floor, she fell and struck her head against the wall. Vera later noticed a dent in the wall in the area where she had struck her head. During the altercation, Vera felt pain in her ear and realized she was missing an earring.

As Vera resisted, Mr. Gutierrez-Valencia produced a pocketknife and held it to Vera's throat. According to Vera, "[H]e also said that see if someone's going to like you without an eye when I take your eye out." Rep. of Proc. (RP) at 413. During the altercation, Mr. Gutierrez-Valencia wrapped his hands around Vera's neck, causing her to feel as though she might faint. Throughout the altercation, Mr. Gutierrez-Valencia repeatedly threatened to kill Vera.

When law enforcement officers arrived, Mr. Gutierrez-Valencia told Vera to remain quiet and led her into the bathroom while holding his pocketknife to her throat. Seeing that Mr. Gutierrez-Valencia appeared frightened by law enforcement's presence,

3

Vera told him she would go outside and tell the police everything was fine. Mr. Gutierrez-Valencia agreed and directed Vera to wash the blood from her face and to "put something on." RP at 414-15. Vera washed her face, applied foundation to her face, and ran out the front the door.

MR. GUTIERREZ-VALENCIA'S ACCOUNT

Mr. Gutierrez-Valencia testified Vera offered him a shower while she prepared breakfast. When Mr. Gutierrez-Valencia exited the shower, Vera inquired if he would prefer to first eat or have sex. The two then had consensual sex before eating breakfast. During breakfast, Vera informed Mr. Gutierrez-Valencia that her ex-boyfriend had threatened to go to the children's school and pick them up if she refused to go on a date with him. Mr. Gutierrez-Valencia questioned why, if Vera was truly afraid of her ex-boyfriend, she had not reported his conduct to the police. Vera lacked an explanation and attempted to leave.

When Vera ran past Mr. Gutierrez-Valencia, he instinctively reached out and grabbed her by the hair to stop her from screaming. While Mr. Gutierrez-Valencia gripped Vera's hair, she jerked around and hit her face on the door. Mr. Gutierrez-Valencia suddenly experienced pain in his back and released Vera. After Mr. Gutierrez-Valencia released Vera, she "kept throwing herself on the ground" and "hitting herself on the door." RP at 693.

4

When officers arrived, Mr. Gutierrez-Valencia instructed Vera to open the door. Vera told Mr. Gutierrez-Valencia to "stay really quiet" and that the police would "leave in a little bit." RP at 696. However, the police then hit the door harder and louder. Vera asked Mr. Gutierrez-Valencia to allow her to apply makeup to her face before answering the door. Vera then opened the door and ran from the apartment, screaming that Mr. Gutierrez-Valencia wanted to kill her.

The officers directed Mr. Gutierrez-Valencia to exit the apartment. Mr. Gutierrez-Valencia complied and was placed under arrest. Officer Thomas Tovar, a certified Spanish speaker with the Yakima Police Department, questioned Mr. Gutierrez-Valencia. Mr. Gutierrez-Valencia told Officer Tovar that he and Vera had been arguing about her ex-boyfriend. He told Officer Tovar that Vera allowed him into the apartment during the day, but not at night. Mr. Gutierrez-Valencia explained that he pulled Vera by the hair and she had hit her head on the wall. He told Officer Tovar that once he released Vera, she began hitting herself. When asked if he had raped Vera, Mr. Gutierrez-Valencia responded that all the sexual contact was consensual.

POSTINCIDENT

Following the altercation, Vera was transported to the hospital for a sexual assault examination. Registered Nurse Amber Diosdado examined Vera and collected evidence. During the examination, Vera informed Nurse Diosdado that she had been restrained, threatened, hit, and strangled to the point she felt she was going to pass out. Vera also

5

told Nurse Diosdado that she felt stressed, threatened, and unable to walk away.  Nurse Diosdado noted that Vera had abrasions around her neck, bruising around her eyes, lower jaw, and arms, and a cut on her lip.  Vera complained of feeling nauseated and having throat or neck pain.

At the Yakima Police Department, Officer Tovar photographed what appeared to be blood on Mr. Gutierrez-Valencia's hands and clothing.  Officer Tovar discovered a pocketknife in Mr. Gutierrez-Valencia's possession.  Detectives Curtis Oja and Lukas Hinton took reference DNA samples from Mr. Gutierrez-Valencia for comparison with the samples collected from Vera at the hospital.

TRIAL

Mr. Gutierrez-Valencia was charged with first degree kidnapping, second degree rape, second degree assault, unlawful imprisonment, felony harassment, and interfering with reporting of domestic violence.

At trial, Vera and Mr. Gutierrez-Valencia testified consistent with the above.  During Vera's testimony the following exchange occurred:

> [PROSECUTOR:]  You said that he had already threatened to kill you?
> [VERA:]  Yes.
> [PROSECUTOR:]  What do you mean?
> [VERA:]  Well, every time he would come he would be like, you know, if you leave me I'm going to kill you.  We're going to be together forever.  And all of the abuse and everything, I was already scared that he was going to do it because *what happened in January was not the first time he had hit me.  There's been lots of other times*.

6

RP at 402 (emphasis added). Defense counsel objected to the testimony being inadmissible evidence of prior bad acts. The court sustained the objection and commented that the jury had already heard evidence of prior threats Mr. Gutierrez-Valenica had made against Vera.

On cross-examination, defense counsel asked Vera if she had fallen during the altercation. She responded in the affirmative. On redirect, the State asked Vera whether any of her property had been damaged when she was knocked down. She responded that the wall had been dented near the location where she had fallen. When asked where the dent came from, Vera stated, "I don't know if I hit my head there. I remember falling and hitting my head." RP at 438.

The jury heard testimony from Nurse Diosdado regarding her examination of Vera and the statements Vera had made to her. Dr. Scott Chapman testified about Vera's injuries, noting she had a laceration to her lip, bruising on her arm, back, cheek bones, and around her eyes. Dr. Chapman testified that Vera's neck had significant bruising, petechia, and tenderness. Dr. Chapman opined the petechia was the result of having her neck "squeezed quite hard." RP at 590. Dr. Chapman concluded his testimony by opining about the potential injury that could be caused by a pocketknife.

Detective Oja testified regarding the biological samples collected from Mr. Gutierrez-Valencia and the photographs taken of Vera's injuries a few days after the

incident. Detective Oja also testified to the photographs taken at Vera's apartment and the damage to the wall.

The jury heard testimony from Ofelia Castillo-Guerrero. Ms. Castillo-Guerrero testified that she had called law enforcement after seeing a woman come from Vera's residence "yell[ing] the word help, help, help many times." RP at 442. She testified she then saw her neighbor get pulled back into her apartment by her hair.

The jury heard testimony from Officers Chris Taylor and Harrison Sargent. Officer Taylor testified, "So once we knocked on the door and received no answer, we confirmed with Officer Tovar that the witness had said that she had seen a female being pulled into that apartment." RP at 377. Defense counsel objected to the testimony as hearsay. The court sustained the objection. Officer Taylor continued, testifying that Officer Tovar had "advised [of] the immediacy of the situation," at which point Officer Taylor and Officer Harrison Sargent decided to force entry. RP at 378. Officer Taylor testified that, after ramming the door, a female exited the apartment and "immediately said . . . help me. He's going to kill me." RP at 380.

After being escorted to his patrol car, Officer Taylor asked Vera what had occurred. Defense counsel objected to the testimony as hearsay. The trial court overruled the objection under the excited utterance exception to the hearsay rule. Officer Taylor then answered, "She said the male, Jose Gutierrez, had threatened to kill her with a knife." RP at 381.

8

Officer Sargent testified:

> At that point we learned from Officer Tovar that the witness told him that she had observed an argument between a male and a female out in the parking lot. The female was screaming and crying for help yelling for the police. And she had said that the male had forcibly pulled back—

RP at 460. Defense counsel objected to the testimony as hearsay. The trial court sustained the objection. Officer Sargent testified that he and Officer Taylor had decided to force entry into the apartment. Officer Sargent testified that a female exited the apartment and that he "saw visible injuries on her face and what looked like what appeared to be blood on her shirt. And she had mentioned something about he was going to kill me." RP at 462. Defense counsel objected to the testimony as hearsay. The trial court sustained the objection.

Officer Sargent then testified that, after securing Mr. Gutierrez-Valencia, he went inside the apartment with Vera and began the interview process. Officer Sargent testified:

> She seemed very scared, seemed like she was having trouble breathing, kind of gasping, still very worked up. Like I said, when I was up closer to her I could see she had a swollen lip, looked like maybe blood on her lip, looked like bruising on her face, maybe a bloody nose. And she was holding onto her left arm like I had said. And I also noticed some blood on her ear. When I asked her about it she said the earring had been ripped out during the altercation.

RP at 464-65. Defense counsel objected to the testimony as hearsay. The trial court sustained the objection.

9

The jury found Mr. Gutierrez-Valencia guilty on all counts. He was later sentenced to 264 months of confinement. Mr. Gutierrez-Valencia timely appeals.

ANALYSIS

Mr. Gutierrez-Valencia contends the trial court improperly allowed the jury to consider inadmissible hearsay, that he was afforded ineffective assistance of counsel, and that the cumulative effect of the errors deprived him of a fair trial.

HEARSAY

Mr. Gutierrez-Valencia argues that Officer Taylor's testimony that Vera told him Mr. Gutierrez-Valencia had threatened to kill her was inadmissible hearsay that should have been excluded from evidence. Because Vera's statement falls under the excited utterance exception to the hearsay rule, we disagree.

We review evidentiary decisions for abuse of discretion. *State v. Rodriquez*, 187 Wn. App. 922, 939, 352 P.3d 200 (2015). "Abuse of discretion occurs when the trial court's ruling is manifestly unreasonable or based on untenable grounds or reasons." *Id*.

Hearsay is a statement, other than one made by a declarant while testifying at the trial, offered to prove the truth of the matter asserted. As a general rule, hearsay is inadmissible. However, hearsay may be admissible if an exception applies.

An excited utterance is an exception to hearsay. An excited utterance is a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). A statement

10

qualifies as an excited utterance if a startling event occurred, the declarant made the statement while under the stress or excitement of the event, and the statement relates to the event. *State v. Magers*, 164 Wn.2d 174, 187-88, 189 P.3d 126 (2008). The first and second element may be determined from circumstantial evidence, such as the declarant's behavior, appearance, condition, and the circumstances under which the statement is made. *State v. Young*, 160 Wn.2d 799, 809-10, 161 P.3d 967 (2007). "The 'key determination is whether the statement was made while the declarant was still under the influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment." *Id.* at 807 (alteration in original) (quoting *State v. Brown*, 127 Wn.2d 749, 758, 903 P.2d 459 (1995)).

Here, the statement at issue is Officer Taylor's testimony that "[s]he said the male, Jose Gutierrez, had threatened to kill her with the knife." RP at 381. Vera made the statement within a minute of running from her apartment crying and yelling, "[H]elp me. He's going to kill me." RP at 380. Vera was crying, shaking, and was extremely emotional when she made the statement.

The close proximity in time between the altercation and the statement, the violent nature of the confrontation, Vera's extremely emotional presentation, and the statement relating to the event, supports the trial court's finding that Vera was under the stress of

the condition when she made the statement. The trial court did not abuse its discretion in admitting the excited utterance.

Mr. Gutierrez-Valencia contends that because Officer Taylor had asked Vera what happened, Vera's statement was not an excited utterance. We disagree.

Excited utterances "can be prompted by a question which itself follows an exciting event, such as asking a crime victim what happened." *State v. Owens*, 128 Wn.2d 908, 913, 913 P.2d 366 (1996). However, "the statements must be 'provoked by the occurrence itself' rather than by the subsequent questioning." *Id.* (quoting *State v. Rivas*, 49 Wn. App. 677, 685, 746 P.2d 312 (1987)). When a victim is subject to extended questioning that allows the victim to reflect on the consequences of the statement, the statement may be the product of the questioning rather than provoked by the occurrence.

Mr. Gutierrez-Valencia directs us to *State v. Ryan*, 103 Wn.2d 165, 176, 691 P.2d 197 (1984), to support his argument that answers in response to questions call into question the reliability of an excited utterance. Unlike the facts before us, in *Ryan* an unknown amount of time passed between the act and the declarant's reporting of it, and the declarant lacked any observable indications of assault, pain, or distress. *Id.* at 177. Further, our Supreme Court's holding in *Owens* distinguishes between statements made during an extended questioning versus those made in response to being asked what happened. 128 Wn.2d at 913.

Officer Taylor asked Vera "what happened" within a minute of her exiting the apartment. RP at 380. Based on Vera's demeanor, the close proximity in time between the confrontation and the statement, and the officer asking only a single question, Vera's response was likely provoked by the occurrence rather than a result of her reflecting on the consequences of her response to Officer's Taylor's question.

The trial court did not abuse its discretion when it admitted Vera's statement to Officer Taylor.

RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

Mr. Gutierrez-Valencia argues that his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution was violated because his trial attorney failed to move for a mistrial "based on State witnesses' repeated introduction of inadmissible hearsay . . . and prior bad acts evidence." Appellant's Opening Br. at 15-16. Mr. Gutierrez-Valencia further argues that his trial counsel was deficient in failing to object when the State, on redirect examination, exceeded the scope of cross-examination.

A criminal defendant has a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). Ineffective assistance of counsel claims are issues of a constitutional magnitude and thus can be considered for the first time on appeal. *State v. Nichols*, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007). We review ineffective

13

assistance of counsel claims de novo. *State v. White*, 80 Wn. App. 406, 410, 907 P.2d 310 (1995).

The burden is on the defendant alleging ineffective assistance to prove that counsel's actions were deficient. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). To succeed on an ineffective assistance of counsel claim, a defendant must show their counsel's actions fell below an objective standard of reasonableness based on consideration of all circumstances, and if so, that there is a reasonable probability that, but for counsel's performance, the outcome of the proceeding would have been different. *Id*. If either is not satisfied then the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

In reviewing the record, there is a strong presumption that counsel's performance was reasonable. *McFarland*, 127 Wn.2d at 335. We review the reasonableness of counsel's performance from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). When counsel's conduct can be characterized as a legitimate trial strategy or tactic, then their performance is not deficient. *Kyllo*, 166 Wn.2d at 863.

If a defendant is capable of showing that defense counsel's performance was deficient, the defendant must also prove prejudice. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). In order to show prejudice, the defendant must show that

14

the errors had more than a simple "conceivable effect on the outcome." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Prejudice is demonstrated by a showing that the proceedings would have been different but for counsel's deficient performance. *McFarland*, 127 Wn.2d at 337. On claims pertaining to trial counsel's failure to bring a motion, a defendant is prejudiced only if the defendant can show that the motion likely would have been granted. *State v. Emery*, 174 Wn.2d 741, 754-55, 278 P.3d 653 (2012).

DEFENSE COUNSEL'S FAILURE TO MOVE FOR A MISTRIAL

Defense counsel objected to hearsay and prior bad acts. Although the court sustained each objection, Mr. Gutierrez-Valencia contends the evidence was so improper that the jury was tainted to the point that curative instructions would not have resolved the resulting prejudice. Consequently, Mr. Gutierrez-Valencia argues defense counsel was deficient in failing to move for a mistrial.

"[A] mistrial should be granted only when the defendant has been so prejudiced that nothing short of a new trial can insure that [the] defendant will be tried fairly." *State v. Gilcrest*, 91 Wn.2d 603, 612, 590 P.2d 809 (1979). When deciding a motion for a mistrial, the court must consider, "(1) the seriousness of the irregularity, (2) whether the statement in question was cumulative of other evidence properly admitted, and (3) whether the irregularity could be cured by an instruction." *State v. Escalona*, 49 Wn. App. 251, 254, 742 P.2d 190 (1987). "'A mistrial should be granted only when 'nothing

15

the trial court could have said or done would have remedied the harm done to the defendant.'"" *State v. Weber*, 99 Wn.2d 158, 165, 659 P.2d 1102 (1983) (quoting *Gilcrest*, 91 Wn.2d at 612).

The first three statements Mr. Gutierrez-Valencia challenges were cumulative of other properly admitted testimony. The first statement—Officer Taylor's testimony that a witness saw "a female being pulled into that apartment"—was cumulative of Ms. Castillo-Guerrero's testimony that she "saw a hand pulling [Vera's] hair." RP at 377, 442. The second statement—Officer Sargent's testimony that the female was "screaming and crying for help yelling for the police" and that she was "forcibly pulled back"—is cumulative of Ms. Castillo-Guerrero's testimony that she heard a woman yelling "help, help, help, many times," and "saw a hand pulling [Vera's] hair." RP at 460, 442. The third statement—Officer Sargent's testimony that Vera "had mentioned something about he was going to kill [her]"—is cumulative of Vera's testimony that she "was . . . scared he was going to kill me," and that she "felt like I was going to die." RP at 462, 410-11.

The fourth statement—Officer Sargent's testimony that when he asked Vera about the blood on her ear "she said the earring had been ripped out"—was cumulative of other properly admitted evidence. RP at 465. Vera testified, "[W]hen he was hitting me I remember my ear was hurt and I was missing one of my earrings." RP at 423. The court admitted photographs showing injuries to Vera's right ear. Officer Taylor testified he photographed droplets of blood on the floor. In close proximity to the droplets of blood,

16

Officer Taylor discovered an earring that appeared similar to the earring Vera was wearing in her left ear.

Because these four statements are cumulative of other properly admitted evidence, Mr. Gutierrez-Valencia is unable to show he has been so prejudiced that nothing short of a new trial would have ensured a fair trial. He has further failed to establish that a motion for a mistrial would have been granted had one been brought.

The fifth statement Mr. Gutierrez-Valencia challenges is Vera's testimony that "what happened in January was not the first time he had hit me. There's been lots of other times." RP at 402. Mr. Gutierrez-Valencia argues that the holding in *Escalona* controls.

In *Escalona*, Mr. Escalona was on trial for second degree assault with a deadly weapon. At trial, the State's sole witness to the alleged crime testified Mr. Escalona "already has a record and had stabbed someone." 49 Wn. App. at 253. On Mr. Escalona's motion, the testimony was struck but the court denied his motion for a mistrial. Mr. Escalona was convicted and appealed. On appeal, the court focused on the seriousness of the irregularity given "the paucity of credible evidence against Escalona." *Id*. at 255. The court recognized the offending witness's testimony "was essentially the State's entire case, contained many inconsistencies" and "[t]here were no other witnesses to the alleged crime except Escalona himself, whose testimony was not substantially impeached." *Id*.

17

Unlike the facts in *Escalona*, here, the State presented more than a paucity of credible evidence. The State offered the testimony of Vera and photographic evidence of her significant injuries. The State offered testimony from independent witnesses, photographs that corroborated Vera's account, a pocketknife found in Mr. Gutierrez-Valencia's possession, and scientific evidence related to biological fluids collected from both Vera and Mr. Gutierrez-Valencia. Further, medical testimony was given by the nurse who conducted a sexual assault examination of Vera, and Vera's treating physician opined on the signs of strangulation he found present on her neck.

Although Vera's statement was improper, its utterance was harmless given the substantial evidence that was properly admitted. Vera's statement was also partially cumulative of other evidence. In sustaining Mr. Gutierrez-Valencia's objection, the court noted, "We did have evidence, we heard the testimony from the witness that she was hoping to gain time. She already spoke about that there had been threats to kill against her. I think that going into the details of what happened before is more prejudicial." RP at 404.

Even if defense counsel was deficient in failing to move for a mistrial, Mr. Gutierrez-Valencia is unable to show such a motion would have been granted. Further, Mr. Gutierrez-Valencia has failed to establish that he was so prejudiced by the evidence that nothing short of a new trial would have ensured a fair trial. Defense counsel was not ineffective in failing to move for a mistrial.

18

DEFENSE COUNSEL'S FAILURE TO OBJECT

Mr. Gutierrez-Valencia contends his defense counsel was ineffective for failing to object to the State, on redirect examination, questioning Vera about a dent in the wall of her apartment.

Defense counsel's actions will not be viewed as ineffective or deficient when their conduct can be classified as a legitimate trial strategy or tactic. *Kyllo*, 166 Wn.2d at 863. "A classic example of trial tactics is when and how an attorney makes the decision to object during trial testimony." *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (citing *State v. Madison*, 53 Wn. App. 754, 762-63, 770 P.2d 662 (1989)). On appeal, "[i]f a defendant [appellant] centers their claim on ineffective assistance of counsel on their attorney's failure to object, then 'the defendant must show that the objection would likely have succeeded.'" *Id*. (quoting *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019)). "'Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.'" *Id*. (quoting *Crow*, 8 Wn. App. 2d at 509).

Redirect examination is utilized "to clarify matters which have become confused in the process of cross-examination, to rehabilitate a witness before the trier of fact, or to rebut testimony elicited on cross-examination." *State v. Mack*, 80 Wn.2d 19, 20-21, 490 P.2d 1303 (1971). As a general rule "when a party opens up a subject of inquiry on direct or cross-examination, he contemplates that the rules will permit cross-examination or

19

redirect examination, as the case may be, within the scope of the examination in which the subject matter was first introduced." *State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969).

Here, during direct examination, Vera testified that she reported to paramedics that she "had a really bad pain in my head." RP at 423. The State asked how she acquired the pain and Vera replied, "I remember hitting the wall when I was trying to get up. I remember I fell back and I hit the wall. I was trying to get back up when he was hitting me." RP at 424.

During cross-examination, defense counsel asked Vera whether she fell to the floor during the physical confrontation. Vera responded in the affirmative. Defense counsel never inquired whether any property was damaged or asked where Vera may have hit her head.

On redirect examination the State asked Vera, without objection from the defense, "When you were knocked down was there any damage to your property that happened?" RP at 438. Vera replied that she remembered damage to the wall. She described the damage as a big dent in the wall. The State then asked, without objection from the defense, where the dent came from. Vera answered, "I don't know if I hit my head there. I remember falling and hitting my head." *Id.*

Even if defense counsel should have objected to the State exceeding the scope of cross-examination on redirect examination, Mr. Gutierrez-Valencia is unable to show an

20

objection would have been successful.  The State's questioning on redirect was likely intended to rehabilitate Vera's assertion that she hit her head.  Moreover, the jury previously heard Vera testify that that she had fallen, hit her head on the wall, and suffered pain as a result.  Vera's testimony on redirect that she had a dent in the wall added little to the State's already strong evidence.

Mr. Gutierrez-Valencia has failed to establish that an objection to the State exceeding the scope of cross-examination would have been successful.  Accordingly, he has failed to show the outcome of the trial would have been different had his trial attorney objected.  Defense counsel was not ineffective in failing to object.

CUMULATIVE ERRORS

Mr. Gutierrez-Valencia argues that the cumulative effect of the errors deprived him of a fair trial.  Having determined there was a lack of prejudicial errors, we disagree.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____        _____
Lawrence-Berrey, C.J.                            Fearing, J.

21