# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  59853-1-II |
| Respondent, | |
| v. | |
| ALEXANDER IAN DUTTON, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, P.J. — Alexander I. Dutton appeals his convictions for one count of second degree child molestation, two counts of third degree rape of a child, and one count of child molestation in the third degree (all domestic violence).  Dutton argues that: (1) his convictions should be reversed because the trial court improperly commented on the evidence during trial or, in the alternative, violated the appearance of fairness doctrine; (2) he received ineffective assistance of counsel during trial; and (3) the trial court erred by imposing court-appointed attorney fees and restitution interest.

We affirm Dutton's convictions.  However, we reverse the court-appointed attorney fees and restitution interest and remand to the trial court to strike Dutton's court-appointed attorney fees and consider whether restitution interest should be waived.

FACTS

A.      BACKGROUND

In November 2021, S.S. (born in 2007) disclosed to her mother that her stepfather, Dutton (born in 1986), had touched her inappropriately when she was 13-14 years old.  Law enforcement

investigated the allegations, and on November 24, 2021, the State charged Dutton with one count

of second degree child molestation, two counts of third degree rape of a child, and one count of

third degree child molestation—all with allegations of domestic violence. The case proceeded to

a jury trial.

B.     TRIAL

1.     Trial Court Judge's Remarks

After opening statements, while waiting for the prosecutor to bring the State's first witness

into the courtroom, the trial court said to the jury:

> Are any of you old enough to remember a [j]udge named Tom Lodge who was on our bench back in the [']70s and [']80s? That name doesn't ring a bell? Okay. This used to be his courtroom when I started out as a lawyer. And . . . it went well '90-93. So, interesting man. He was a tank commander in the Korean war and a quarterback for the Vancouver High School football team. Fairly—fairly stern law and order type of guy, but back then there—when he started, there were only two [s]uperior [c]ourt judges in Clark County. Now we're—just got approval for the twelfth. The legislature has approved, so I think this summer we're gonna see a twelfth [s]uperior [c]ourt judge come online. But, we're pushing 550,000 people in Clark County.
>
> Does anyone remember the name Robert Harris who was a [j]udge here on our bench for about 30 years? He had his courtroom right across the hall there. He presided over, among other cases, the Wes[t]ley Al[l]an Dodd case, which is a very famous local case. That was the last person to be executed by hanging in the entire United States. They abolished that nationwide after about [']90-93. So pretty horrific crimes.
>
> All right. Come forward, please. We'll get [S.S.] up here and then I'll swear [S.S.] in. And please raise your right hand.

1 Verbatim Rep. of Proc. (VRP) (Mar. 5, 2024) at 88-89. The trial court subsequently swore in

S.S. as a witness, and the State proceeded with her testimony.

2.      Evidence

a.      S.S.'s testimony

S.S.'s mother, Samantha Batchelor, was married to Dutton.  Dutton began living with their family early in his relationship with Batchelor when S.S. was around 11 years old.  S.S. explained that Dutton developed a parental role as he became more involved in the family.

When S.S. was 13 years old, she began spending time with Dutton alone.  One night, Dutton asked S.S. to watch television with him after everyone had gone to bed.  The two would stay up late to watch television "[s]emi-regularly."  1 VRP (Mar. 5, 2024) at 109.  S.S. explained that when they watched, she and Dutton would sit on their L-shaped sectional, and S.S. would sit propped up against him.  S.S. explained that over time, Dutton grew "a lot more touchy."  1 VRP (Mar. 5, 2024) at 111.  Dutton would put his arm around S.S. or rest his hand on her thighs.

The touching escalated, and Dutton touched S.S.'s vagina for the first time when she was 13 years old.  S.S. explained that Dutton would lay his hand on her vagina, and he eventually began rubbing it.  Dutton first touched her vagina over the clothing, but over time, he began touching her under her pants but over her underwear, and then eventually under her underwear.  S.S. testified that she was 13 or 14 years old when Dutton first penetrated her vagina with his fingers.

On one occasion, Dutton touched her vagina with his tongue.  S.S. explained that Dutton "had been wanting to try something new and told [S.S.] that he really thought [she] would enjoy it."  1 VRP (Mar. 5, 2024) at 125.  S.S. initially refused, but she gave in because she "didn't want to cause problems."  1 VRP (Mar. 5, 2024) at 126.  Dutton brought S.S. to the edge of the couch, pulled her pants and underwear down to her ankles, got in between her thighs, and S.S. felt his tongue on her vagina.

3

Dutton also touched S.S.'s breasts. S.S. testified that he would drape his arms over her breasts. Eventually, Dutton told S.S. that he wanted to try something that "he thought [S.S.] would enjoy." 1 VRP (Mar. 5, 2024) at 120. Dutton pushed up her clothes and touched her breasts with his hands and mouth. S.S. also discussed a specific instance when Dutton "masturbate[d] with his [penis] while pushing it into [her breasts.]" 1 VRP (Mar. 5, 2024) at 123. Dutton touched her breasts at least twice.

Dutton would sometimes touch his penis while touching S.S. On more than one occasion, Dutton placed her hand on his penis and moved it up and down. One time, Dutton asked S.S. to touch his penis in this manner on her own, and she did. S.S. explained that the movie nights typically ended when Dutton ejaculated.

S.S. testified that the touching "semi-stopped" before she turned 15 because she began high school and could no longer stay up late. 1 VRP (Mar. 5, 2024) at 130. When the touching occurred, S.S. was homeschooled, and her mother talked to her about sex "[a] little bit, but not a whole lot." 1 VRP (Mar. 5, 2024) at 137. S.S. also explained that she did not disclose the inappropriate touching earlier because she did not think her stepfather would do anything inappropriate to her, and she was concerned about the impact on her family.

S.S. eventually disclosed the touching to Batchelor after Batchelor and Dutton had "a big conflict" that caused him to leave the home. 1 VRP (Mar. 5, 2024) at 141. Batchelor asked S.S. if Dutton had "done anything, if he had touched [her] inappropriately." 1 VRP (Mar. 5, 2024) at 140. Although S.S. did not remember what she first said to her mother, S.S. testified that she "just said yes and that was the end of it." 1 VRP (Mar. 5, 2024) at 141. S.S. explained that this was the first time her mother had asked her a question of that nature.

b.      Batchelor's testimony

Batchelor testified that as S.S. became a teenager, she wanted to stay up later to watch television. S.S. and Dutton watched television late at night about once a week. Batchelor and her other children were usually asleep when S.S. and Dutton would stay up late.

Batchelor also testified regarding S.S.'s disclosure about Dutton. Batchelor explained that she "regularly ask[ed] [her] children very pointed and specific questions" such as whether anyone had ever touched them. 1 VRP (Mar. 5, 2024) at 162. Batchelor testified that a friend was concerned by signs she had seen in S.S., so Batchelor asked each child whether anyone had touched them. S.S. said yes, so Batchelor "asked a few follow up questions to kind of suss out what [they] were talking about." 1 VRP (Mar. 5, 2024) at 163. When Batchelor first asked S.S. if anyone had touched her inappropriately, S.S. "didn't really want to talk about it" so Batchelor "had to kind of draw out some of the answers." 1 VRP (Mar. 5, 2024) at 164. Batchelor "asked a few questions to follow up to see if it was like [S.S.] misunderstood something or if it went further. And when [Batchelor] asked more questions, [S.S] started to divulge more and more details." 1 VRP (Mar. 5, 2024) at 164. Batchelor contacted law enforcement after S.S.'s disclosure.

c.      Officer Seifert's testimony

Officer Neil Seifert was the detective assigned to S.S.'s case in November 2021. During Officer Seifert's testimony, the State introduced a video of his interview with Dutton. During the interview, Dutton told Officer Seifert that he "may have touched [S.S.] in her inappropriate places," but he never touched her intentionally. 1 VRP (Mar. 5, 2024) at 216. Dutton explained that it was possible he could have grazed S.S.'s vagina or breasts accidentally, and he stated that "there [have] been like leg massages and stuff and that's it." 1 VRP (Mar. 5, 2024) at 219.

5

d.      Pegler's testimony

Deedee Pegler, a forensic interviewer for the Children's Justice Center, interviewed S.S. in November 2021.

Pegler explained that forensic interviewers are trained to ask about children's experiences in a non-suggestive, non-leading manner because "children tend to be more suggestable than adults." 1 VRP (Mar. 5, 2024) at 178. Pegler also testified that S.S. disclosed sexual abuse to her, and that S.S. felt guilty for not stopping Dutton sooner, as well as for disclosing at that time.

e.      Dutton's testimony

Dutton testified that he did not have sexual contact with S.S. He believed S.S. fabricated these allegations because Batchelor made allegations of domestic violence against Dutton.

On cross-examination, Dutton testified that he would stay up late with S.S. to watch movies and shows. He explained that S.S. would lean against him and cuddle with him. Dutton also testified that he would give S.S. leg massages, which he would do for Batchelor as well, and he would rub S.S.'s collarbone area.

3.      Closing Arguments

During closing arguments, the State argued that Dutton's own words in the police interview confirmed parts of S.S.'s story.

Dutton's defense counsel argued that Dutton was credible and denied the allegations. Defense counsel further argued that children are easily manipulated and "lie for all sorts of reasons" including "to protect a parent from an alleged domestic violence allegation." 1 VRP (Mar. 6, 2024) at 287.

During the State's rebuttal closing argument, the State contended that S.S. did not fabricate these allegations. Reminding the jury that S.S. was a 13-year-old, homeschooled girl when the touching started, the State argued:

> How would she make up something so detailed, and two and a half years later be telling you a consistent story of what happened? She would have to be an extraordinary actress and she would have to be a Machiavellian genius. Did she strike you as either of those things, or did she strike you as a traumatized 16-year-old?

1 VRP (Mar. 6, 2024) at 290. The State also argued that S.S. was credible based on aspects of her story that were consistent with Dutton's police interview.

### 4. Verdict

At the conclusion of trial, the jury found Dutton guilty of one count of second degree child molestation, two counts of third degree rape of a child, and one count of third degree child molestation. The jury also found that Dutton and S.S. were members of the same family or household to support the domestic violence allegation.

## C. SENTENCING

The trial court found that Dutton was indigent. Defense counsel asked the court to waive all discretionary fines.

The trial court imposed 108 months of confinement and 36 months of community custody. The trial court also imposed $3,000 in fees for the court-appointed attorney and restitution in the amount of $728.32, which defense counsel did not dispute. The amount of restitution began accruing interest on the date of judgment and sentence.

ANALYSIS

Dutton argues that his convictions should be reversed because the trial court improperly commented on the evidence during trial or alternatively violated the appearance of fairness doctrine. Dutton also argues that he received ineffective assistance of counsel during trial. Finally, Dutton argues that the trial court erred by imposing court-appointed attorney fees and restitution interest.

A.    TRIAL COURT'S REMARKS

Dutton contends that the trial court's remarks about Westley Allan Dodd were improper for two reasons. First, Dutton asserts that the trial court "made an implied comment on the evidence by sua sponte referencing a gruesome and famous child rape and murder case when Mr. Dutton stood trial on charges of child rape and molestation." Br. of Appellant at 16 (italics omitted). Second, Dutton alternatively argues that even if the trial judge did not comment on the evidence, Dutton's due process rights were violated under the appearance of fairness doctrine. We disagree.

1.    No Improper Comment on Evidence

Juries should not be influenced by a trial judge's opinion on the evidence. *State v. Lee*, 5 Wn.3d 734, 750, 582 P.3d 271 (2026). Under article IV, section 16 of the Washington State Constitution, "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."

Constitutional violations, including judicial comments on the evidence, are reviewed do novo. *Id.* To determine whether words or actions constitute a comment on the evidence, we review the facts and circumstances of each case. *Id.*

Here, while everyone was waiting for the State to bring its first witness into the courtroom to testify, the trial court spoke to the jury about two retired judges. Dutton assigns error to the following remarks the trial court made about retired Judge Harris:

> "Does anyone remember the name Robert Harris who was a [j]udge here on our bench for about 30 years? He had his courtroom right across the hall there. He presided over, among other cases, the Wesley Alan [sic] Dodd case, which is a very famous local case. That was the last person to be executed by hanging in the entire United States. They abolished that nationwide after about [']90-93. So pretty horrific crimes."

Br. of Appellant at 20 (italics omitted) (some alterations in original) (quoting 1 VRP (Mar. 5, 2024) at 89).

Dutton did not object to these statements at trial; instead, Dutton argues for the first time on appeal that the trial court's statements were an impermissible "implied comment on the evidence." Br. of Appellant at 16. Even assuming the issue was preserved, it fails because the trial court's remarks were not a comment on the evidence.

"A comment on the evidence is impermissible where it conveys to the jury the judge's personal attitudes toward the merits of the case or leads the jury to infer that the judge personally believed the testimony at issue." *Lee*, 5 Wn.3d at 751. "For the comment to be impermissible, the court's attitude toward the merits of the case must be 'reasonably inferable from the nature or manner of the questions asked and the things said.'" *Id.* (internal quotation marks omitted) (quoting *State v. Brown*, 31 Wn.2d 475, 486, 197 P.2d 590 (1948)). "'The touchstone of error in a trial court's comment on the evidence is whether the feeling of the trial court as to the truth value of the testimony of a witness has been communicated to the jury.'" *Id.* (quoting *State v. Lane*, 125 Wn.2d 825, 838, 889 P.2d 929 (1995)).

Citing *State v. Lampshire*, 74 Wn.2d 888, 447 P.2d 727 (1968), Dutton argues that the trial court's remarks "'implicitly conveyed to the jury' the judge's 'personal opinion' about justice and punishment." Br. of Appellant at 21 (quoting *Lampshire*, 74 Wn.2d at 891). Dutton acknowledges that the trial court "did not share the nature of Dodd's crimes" but argues that the remarks were an implicit comment on the evidence because the *Dodd* case was "an infamous local case involving child rape and molestation." Br. of Appellant at 21, 22.

Here, the trial court did not make an impermissible comment on the evidence. Rather, the challenged remarks were merely statements about the history of the court that the trial court shared after opening statements while waiting for a witness to come to the courtroom to testify. At the time the trial court made its statements, no evidence had been presented; thus, the trial court did not comment on the evidence at all. Nothing in the trial court's remarks conveyed the trial court's views regarding the merits of the case. Accordingly, Dutton's challenge fails.

2.      Appearance of Fairness

Dutton alternatively argues that even if the trial court did not comment on the evidence, Dutton's due process rights were violated under the appearance of fairness doctrine. Dutton contends that the trial court's "unnecessary and irrelevant remarks about the Westley Allan Dodd hanging violated the appearance of fairness doctrine." Br. of Appellant at 24.

Although Dutton argues that the improper comment on the evidence was a manifest error affecting a constitutional right, Dutton does not argue that the alleged violation of the appearance of fairness doctrine was a manifest error affecting a constitutional right. When a defendant raises a new argument on appeal, they must generally address RAP 2.5(a) in their brief; otherwise, the issue is waived. *State v. Frieday*, 33 Wn. App. 2d 719, 743, 565 P.3d 139, *review denied*, 5 Wn.3d

1006 (2025), *cert. denied*, ___ S. Ct. ___, 2026 WL 490556 (2026). Accordingly, we decline to review this argument.[1]

B.      INEFFECTIVE ASSISTANCE OF COUNSEL

Dutton argues that he received ineffective assistance of counsel during trial. Dutton contends that his defense counsel was deficient by failing to request a curative instruction or mistrial after the trial court judge made the alleged improper comments. He also contends that defense counsel's performance was deficient because defense counsel "conducted little to no cross-examination, including of key State witnesses." Br. of Appellant at 37. Finally, Dutton asserts that his defense counsel failed to object to "inflammatory and inappropriate comments" during the State's rebuttal closing argument. Br. of Appellant at 43.

---

[1] Even if we considered this challenge, Dutton's argument fails. Under the appearance of fairness doctrine, "a judicial proceeding is valid if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing." *State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703 (2017). The judge must not only be impartial; the judge must also appear to be impartial. *Id.* "The test for determining whether the judge's impartiality might reasonably be questioned is an objective test that assumes a reasonable observer knows and understands all the relevant facts." *Id.* "A party asserting a violation of the doctrine must produce sufficient evidence demonstrating bias, such as personal or pecuniary interest on the part of the decision maker; mere speculation is not enough." *In re Pers. Restraint of Haynes*, 100 Wn. App. 366, 377 n.23, 996 P.2d 637 (2000).

Dutton argues that the trial court "digressed about an irrelevant and highly prejudicial topic in front of the jury" such that his comments demonstrated the appearance of bias. Br. of Appellant at 26. Dutton has not produced any evidence demonstrating bias on the part of the trial court; Dutton merely points to the trial court's remarks that Dodd's crimes were "'horrific.'" Br. of Appellant at 26.

The trial court's discussion of the *Dodd* case did not demonstrate bias; the trial court made these remarks while discussing retired superior court judges and did not discuss the specifics of Dutton's or Dodd's case. Moreover, Dutton does not identify, nor does the record show, any evidence that the trial court was biased such that a reasonable observer would question the judge's impartiality. Accordingly, even if we considered Dutton's challenge, the challenge would fail.

11

1.       Legal Principles

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantees the right to effective assistance of counsel. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an ineffective assistance of counsel claim, the appellant must show that defense counsel's performance was deficient and that the deficient representation prejudiced the appellant. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024); *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

"To establish deficient performance, a defendant must show that counsel's actions 'fell below an objective standard of reasonableness based on consideration of all the circumstances.'" *Bertrand*, 3 Wn.3d at 130 (quoting *State v. Vazquez*, 198 Wn.2d 239, 247-48, 494 P.3d 424 (2021)). But counsel's performance is not deficient when the conduct can be characterized as legitimate strategy or tactics. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). A criminal defendant "'must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" *Vazquez*, 198 Wn.2d at 248 (quoting *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995)).

We strongly presume that defense counsel's performance was reasonable. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014). "A criminal defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" *Id.* (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

To show prejudice, the appellant must show that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *Kyllo*, 166 Wn.2d at 862). A reasonable probability is that which is "'sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

2.      Alleged Failure to Request Curative Instruction or Mistrial

Dutton contends that his defense counsel was deficient by failing to request a mistrial or a curative instruction after the trial court judge shared the Westley Allan Dodd anecdote. We disagree.

To prevail on a claim that defense counsel's failure to request a mistrial constituted deficient performance, Dutton must show that the request would have been granted. *See State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012) (applying the same standard for a motion to sever). "'[A] mistrial should be granted only when the defendant has been so prejudiced that nothing short of a new trial can insure that defendant will be tried fairly.'" *State v. Gaines*, 194 Wn. App. 892, 897, 380 P.3d 540 (2016) (alteration in original) (quoting *State v. Gilcrist*, 91 Wn.2d 603, 612, 590 P.2d 809 (1979)).

To establish ineffective assistance of counsel based on "counsel's failure to request a particular jury instruction, the defendant must show [they were] entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice." *State v. Thompson*, 169 Wn. App. 436, 495, 290 P.3d 996 (2012), *review denied*, 176 Wn.2d 1023 (2013).

Here, Dutton cannot establish deficient performance because, as discussed above, the trial court did not make an improper comment on the evidence. Therefore, the trial court would not have granted a request for a mistrial. Nor would Dutton be entitled to a curative instruction. Thus, Dutton cannot show deficient performance based on defense counsel's failure to request a mistrial or curative instruction.

3.      Extent of Cross-examination

Next, Dutton argues that his defense counsel performed deficiently by "conduct[ing] little to no cross-examination, including of key State witnesses." Br. of Appellant at 37. Dutton contends that his defense counsel should have cross-examined S.S. and Batchelor about inconsistencies regarding S.S.'s initial disclosure to Batchelor. Dutton also contends that defense counsel should have cross-examined Pegler, the forensic interviewer, about the questions Batchelor asked S.S. before the forensic interview. Dutton asserts that "there was no tactical reason to fail to ask these questions" where S.S.'s credibility was the central defense raised by the defense. Br. of Appellant at 42. We disagree.

Cross-examination is entrusted to the professional discretion of counsel. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 720, 101 P.3d 1 (2004). While hindsight may allow the reviewing court to "'speculate as to whether another attorney could have more efficiently attacked the credibility of . . . witnesses[,] . . . [t]he extent of cross-examination is something a lawyer must decide quickly and in the heat of the conflict. This . . . is a matter of judgment and strategy.'" *Id.* (some alterations in original) (quoting *State v. Stockman*, 70 Wn.2d 941, 945, 425 P.2d 898 (1967)).

Courts need not determine trial counsel's reasons for not cross-examining witnesses if counsel's approach is within the range of reasonable representation. *Id.* "A decision not to cross[-]examine a witness is often tactical because counsel may be concerned about opening the door to damaging rebuttal or because cross[-]examination may not provide evidence useful to the defense." *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 451, 21 P.3d 687 (2001). "[E]ven a lame cross-examination will seldom, if ever, amount to a Sixth Amendment violation." *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 489, 965 P.2d 593 (1998).

Here, the record shows that defense counsel's limited cross-examination of S.S. and Batchelor was likely a trial strategy. It was reasonable for defense counsel to choose not to cross-examine S.S. and Batchelor on inconsistencies between S.S.'s and Batchelor's testimony regarding the disclosure because the jury heard the testimony from both witnesses that included the inconsistencies.

Moreover, S.S. testified that she was finally able to disclose to Batchelor after Batchelor and Dutton had "a big conflict" that caused him to leave the home. 1 VRP (Mar. 5, 2024) at 141. Defense counsel may have made the strategic decision to limit cross-examination of S.S. and Batchelor to avoid further emphasizing for the jury that Dutton committed acts of domestic violence.

Further, Dutton argues that defense counsel should have cross-examined Pegler "about the extensive and pointed questions Ms. Batchelor asked [S.S.] before the forensic interview." Br. of Appellant at 41-42. But the extent of cross-examination is a strategic trial decision entrusted to the professional discretion of counsel such that we need not determine defense counsel's reasons for not cross-examining Pegler on these specific points. Moreover, based on the evidence against

15

Dutton, more probably than not, the outcome would not have been different had defense counsel cross-examined Pegler on Batchelor's questions to S.S. Accordingly, defense counsel's decisions regarding cross-examination are supported by the record as reasonable trial strategy and do not rise to the level of deficient performance.

4.      No Objection to Prosecutor's Statements

Dutton also argues that defense counsel "failed to object to inflammatory and inappropriate comments during the State's rebuttal closing argument." Br. of Appellant at 43. Dutton contends that defense counsel was deficient for failing to object to the following statement:

> "How would she make up something so detailed, and two and a half years later be telling you a consistent story of what happened? She would have to be an extraordinary actress and she would have to be a Machiavellian genius. Did she strike you as either of those things, or did she strike you as a traumatized 16-year-old?"

Br. of Appellant at 44 (italics omitted) (quoting 1 VRP (Mar. 6, 2024) at 290). Dutton asserts that defense counsel should have objected to these comments because they improperly "expressed a personal opinion on [S.S.'s] veracity."[2] Br. of Appellant at 45. We disagree.

"If a defendant centers their claim of ineffective assistance of counsel on their attorney's failure to object, then 'the defendant must show that the objection would likely have succeeded.'" *Vazquez*, 198 Wn.2d at 248 (quoting *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541, *review denied*, 193 Wn.2d 1038 (2019)).

It is improper for a prosecutor to express their personal opinion on a witness' credibility. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014). It must be clear and unmistakable

---

[2] Although Dutton argues that his defense counsel was deficient for failing to object to these "improper" statements, Dutton does not allege prosecutorial misconduct. Br. of Appellant at 45.

that the prosecutor is expressing a personal opinion. *Id.* at 438 (holding the statement "the most ridiculous thing I've ever heard" was improper and highlighting that "I've ever heard" was an obvious expression of personal opinion as to credibility). However, prosecutors may comment on witness credibility based on the evidence. *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010).

Here, the State did not make a clear and unmistakable expression of the prosecutor's personal opinion; rather, the State argued that the jury should believe S.S. based on the evidence and based on S.S.'s demeanor. Because the prosecutor's statements were not improper, Dutton cannot show an objection to the prosecutor's argument would likely have succeeded. Accordingly, Dutton's defense counsel was not deficient for failing to object to the State's closing argument remarks. Dutton's ineffective assistance of counsel claim fails.

C.    ATTORNEY FEES AND RESTITUTION INTEREST

Dutton argues that the trial court erred in ordering $3,000 in court-appointed attorney fees because they are discretionary and Dutton is indigent. The State concedes that the court-appointed attorney fees should be stricken.

Sentencing courts are prohibited from imposing discretionary costs on a defendant who is indigent, including court-appointed attorney fees. RCW 10.01.160(3); *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018). Here, the trial court imposed court-appointed attorney fees despite finding that Dutton is indigent. Because court-appointed attorney fees are discretionary costs, we accept the State's concession and remand to the trial court to strike the $3,000 in court-appointed attorney fees from Dutton's judgment and sentence.

Dutton also argues that the trial court erred by ordering restitution interest without considering the factors outlined in RCW 10.82.090(2).

Under amendments to RCW 10.82.090, effective January 1, 2023, Washington courts may refrain from imposing restitution interest. LAWS OF 2022, ch. 260 § 12. RCW 10.82.090(2) states:

> The court may elect not to impose interest on any restitution the court orders. Before determining not to impose interest on restitution, the court shall inquire into and consider the following factors: (a) Whether the offender is indigent as defined in RCW 10.01.160(3) or general rule 34; (b) the offender's available funds, as defined in RCW 10.101.010(2), and other liabilities including child support and other legal financial obligations; (c) whether the offender is homeless; and (d) whether the offender is mentally ill, as defined in RCW 71.24.025. The court shall also consider the victim's input, if any, as it relates to any financial hardship caused to the victim if interest is not imposed. The court may also consider any other information that the court believes, in the interest of justice, relates to not imposing interest on restitution. After consideration of these factors, the court may waive the imposition of restitution interest.

Under RCW 10.82.090(2), a trial court is required to consider the enumerated factors if a defendant requests that the court not impose restitution interest.

Here, although Dutton did not specifically request that the trial court not impose restitution interest, Dutton did ask the court to waive "all discretionary fines" at sentencing. 1 VRP (May 30, 2024) at 353. Because restitution interest is discretionary and Dutton asked the trial court to waive all discretionary fines, the trial court should have considered the factors in RCW 10.82.090(2) in determining whether to impose restitution interest.

Accordingly, we reverse the court-appointed attorney fees and restitution interest, and we remand to the trial court to strike the $3,000 in court-appointed attorney fees and determine whether to impose restitution interest by considering the factors in RCW 10.82.090(2).

18

CONCLUSION

We affirm Dutton's convictions, but we reverse the imposition of court-appointed attorney fees and restitution interest. We remand to the trial court to strike his court-appointed attorney fees and consider whether to impose restitution interest under the factors outlined in RCW 10.82.090(2).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, P.J.

We concur:

Cruser, J.

Che, J.